## LATOUR CORPORATION v. E. B. LATHAM CO.

District Court, S. D. New York.

Jan. 11, 1934.

Pennie, Davis, Marvin & Edmonds, of New York City, and William H. Davis, of New York City, and William H. Taylor, of St. Albans, L. I., N. Y., for plaintiff.

Cooper, Kerr & Dunham, of New York City, and Drury W. Cooper, of New York City, Cornelius D. Ehret, of Philadelphia, Pa., and C. Blake Townsend and H. Frank Wiegand, both of New York City, for defendant.

BONDY, District Judge.

The bill of complaint alleges the infringement of Claims 1, 11, 15 and 18 of Reissue Patent No. 16,461, and Claims 9 and 11 of Patent No. 1,614,136, granted to the plaintiff as assignee of Marius C. A. Latour.

The suit is defended by Atwater Kent Manufacturing Company which manufactured the defendant's accused Atwater-Kent Receiver Model No. 35.

The reissue patent relates to a radio broadcast receiver combining multi-stage radio frequency amplification, detection and audio frequency amplification, a common B battery supplying current to the plate circuits of the high frequency amplifier tubes, the detector tube and the low frequency amplifier tube or tubes, shunting capacities (condensers) arranged to divert the high frequency current from the low frequency amplifier and stabilizing resistances connected in parallel either on the primary or secondary coils of the high frequency transformers.

The condensers and resistances are introduced into the combination to increase the stability of the receiver, being made necessary by the fact that multi-stage radio frequency amplification has a tendency to self-generation of disturbing high frequency oscillations. The condenser diverts the high frequency current from directly entering the audio frequency amplifier. The resistances have the effect of consuming energy and damping the high frequency current in each stage of amplification, thereby making possible greater total amplification, without the production of disturbing oscillations, than could otherwise be obtained.

The claims of the reissue patent in suit read as follows: "1. In a high-frequency signaling system, the combination of a plurality of thermionic relays arranged in cascade and including a high-frequency amplifier relay, a low-frequency amplifier relay, and an intermediate thermionic detector relay, means for coupling said relays comprising transformers coupling the output circuit of each of said relays to the input of the succeeding relay, a common source for supplying space current to all of said relays, a condenser shunting a winding of the transformer coupling said detector relay with said low frequency amplifier relay, whereby high frequency current is diverted from said low frequency relay and the tendency to the production of high frequency oscillations through the use of said common source is reduced, and supplemental means for preventing high frequency oscillations."

Claim II, a method claim, reads as follows: "In a system consisting of a plurality of thermionic relays of the audion type arranged in cascade, the method of receiving radio signals and of obtaining a higher degree of amplification of such signals than is possible with amplification at frequencies of one order of magnitude only with a minimum of current sources for said relays and without the occurrence of disturbing noises, which comprises introducing reactions opposing the production of disturbing high frequency oscillations in the system, successively amplifying the signal current at high frequency to a higher degree than would be possible without the production of oscillations in the absence of said opposing reactions, detecting the amplified high frequency signal current, amplifying the detected signal current at low frequency, supplying space current to all of said relays from a common source, diverting high frequency current from the low frequency circuits, whereby the production of high frequency oscillations through the use of said common source is substantially prevented, and translating the amplified low frequency current into sound waves."

Claim 15, also a method claim, reads as follows: "In a system consisting of a plurality of thermionic relays of the audion type arranged in cascade, the method of receiving radio signals and of obtaining a higher de-

gree of amplification of such signals than is possible with amplification at frequencies of one order of magnitude only, without the occurrence of disturbing noises, which comprises introducing damping to prevent disturbing high frequency oscillations in the system, successively amplifying the signal current at high frequency to a higher degree than would be possible without the production of oscillations in the absence of said damping, detecting the amplified high frequency signal current, amplifying the detected signal current at low frequency, preventing high frequency current from affecting the low frequency amplifying step and translating the amplified low frequency current into sound waves."

Claim 18 reads as follows: "A thermionic relay system for receiving radio signals wherein a higher degree of amplification of such signals is obtained than is possible with amplification at frequencies of one order of magnitude only, without the occurrence of disturbing noises, comprising a plurality of transformer-coupled thermionic relays of the audion type in cascade circuit arrangement, resistance damping means associated with certain of said transformers for introducing reactions opposing the production of disturbing high frequency oscillations in the system, means including a certain plurality of said circuits, transformers and relays for successively amplifying the signal current at high frequency to the highest degree possible without the production of disturbing oscillations which tend to be produced in spite of said means introducing opposing reactions, means including one of said relays with its circuits for detecting the amplified signal current, a thermionic relay for amplifying the detected signal current at low frequency, and means for translating the amplified low frequency signal current into sound waves."

The Atwater-Kent receiver model No. 35 combines all the elements claimed: multistage radio frequency amplification, detection, audio frequency amplification, damping resistances, a common B battery supplying current to the plate circuits of all the vacuum tube relays and a by-pass condenser arranged to keep the high frequency current out of the low frequency amplifying stages.

Latour's condenser 12 shunts only the terminals of the primary coil of the audio frequency transformer. The Atwater-Kent condenser C 10 shunts the.plate and filament of the detector tube. It also shunts the B battery as well as the primary coil of the

first audio transformer. It thus keeps the high frequency currents out of the primary coil of the audio transformer and also out of the B battery. Latour's condenser keeps the high frequency current from directly entering the audio frequency transformer but not out of the battery. Both shunt the primary windings of the transformer and prevent or reduce the disturbing oscillations which would result if the high frequency current were permitted to flow directly into the audio-frequency amplifier. The defendant's condenser by also keeping the high frequency current out of the battery is an improvement over Latour's condenser but does not avoid his claim.

The defendant contends that because Latour's condenser does not keep the high frequency current out of the battery the tendency to the production of disturbing oscillations will be increased, contrary to what Latour sought to accomplish by his condenser and contrary to what he claims. It appears that if Latour's B battery should run down disturbing oscillations would be produced, whereas in defendant's device the additional by-passing of the battery by the condenser eliminates this difficulty. However, under normal conditions of operation in both Latour's and defendant's condenser connection the tendency to produce disturbing oscillations is reduced by keeping the high frequency current from directly entering the low frequency amplifier. Condenser C 10 of the defendant's receiver corresponds to condenser C 12 in Latour's even though it does something more.

The defendant's stabilizing resistances are associated with the secondary coils of the radio frequency transformers. Latour's drawings show resistances associated with the primary coils of the radio frequency transformers. Latour's specification, however, states ."a resistance 16 will be then connected in parallel either on the primary or secondary of the high frequency transformers in order to introduce the necessary damping."

The evidence establishes that defendant's resistances are in parallel with the secondary coils, though they have the fixed grid-filament capacities of the respective vacuum tubes in series with them.

Claims 11 and 18 specify damping means for "introducing reactions opposing the production of disturbing high frequency oscillations." The defendant contends that resistances 16 can never introduce reactions and that the claims are therefore void or

not infringed. It is evident that the word "reactions" was used to describe the effect of the resistances. But this is at most a question of choice of language. It is evident that by reactions resistances were meant.

Claim 18 specifies means "for successively amplifying the signal current at high frequency to the highest degree possible without the production of disturbing oscillations." Defendant urges that neither Latour's nor its receiver does this.

In the specification of the patent it is stated: "The object of the present invention is to indicate a process enabling the number of successive amplifications that may be effected in practice to be increased for the purpose of reception in wireless telegraphy.", and "Then when the maximum number of high-frequency amplifications that can in this way be effected in practice has been reached, in detecting the high-frequency current. * * *"

It is apparent that "to the highest degree possible" was intended to mean to the highest degree that can be effected with advantage in practice.

The long distance broadcast receivers used by the American Telephone & Telegraph Company in its world-wide tests in 1915, described in the U. S. Patent No. 1,-504,537, did not have multi-stage radio frequency amplification, stabilizing resistances, a common B battery for all the tubes or means for keeping the high frequency current out of the low frequency amplifier.

The receivers used by the General Electric Company in its tests in the years 1913, 1914 and 1915 did not have multi-stage radio frequency amplification, stabilizing resistances, or any condenser similar to Latour's condenser 12, though there is some evidence that a common B battery eliminator which had a large by-pass condenser was used.

The General Electric engineers and the telephone company's engineers in these broadcasting tests tried to add a second stage of radio frequency amplification to their amplifiers but abandoned the attempts on account of the difficulty of controlling oscillations. They did not stabilize the radio frequency stages by the addition of damping resistances, which, though they reduce the amplification by each tube, result in a stable amplifier with increased amplifying power.

Alexanderson Patent No. 1,173,079 discloses multi-stage radio frequency amplifi-cation but not any common B battery, by-pass condenser or stabilizing resistance.

This Alexanderson patent was considered by the Patent Office before the claims in suit were allowed by it.

Langmuir Patent No. 1,282,439 discloses multi-stage radio frequency amplication, a detector and audio frequency amplification. It also discloses capacities in shunting connections across both the primary and secondary coils of the audio frequency transformer to keep radio frequency current out of the audio frequency amplifier. It discloses C batteries in the grid leads of the radio frequency amplifier tubes, which the defendant urges are the equivalent of the stabilizing resistances of the Atwater-Kent Model 35 and anticipatory of Latour's stabilizing resistances.

It appears that a stabilizing effect can only be attained by the use of C batteries when they supply a positive potential to the grid. Langmuir, however, in his patent expressly states, in referring to Fig. 2, that the grid is preferably negative. It is true that in speaking of Fig. 1 he states that in some cases the grid may be maintained at a positive potential. But Fig. 1 does not disclose multi-stage radio frequency amplification. In a paper on "The Pure Electron Discharge" read by Langmuir before the Institute of Radio Engineers on April 7, 1915, referring to amplifier circuits such as Alexanderson's, he stated: "A second factor of importance is the magnitude of the current taken by the grid. In order to get the greatest amplifying power it is desirable to have this current as low as possible." To accomplish this the grid must be made negative.

Langmuir was dealing with the question of amplification and not stability and he recommended that the grid should be negative. The mere statement, when referring to Fig. 1 of his patent, not involving multi-stage radio frequency amplification, that in some cases the grid may be maintained at a positive potential, can not be deemed anticipatory of Latour's stabilizing resistances in multi-stage radio frequency amplifier stages.

The disclosures of this patent were considered by the examiner before the issuance of the patent in suit. (See Langmuir's patents No. 1,282,439 and No. 1,297,188 in which identical disclosures are made.)

Heising Patent No. 1,199,180 discloses a multi-stage tuned radio frequency amplifier for use in a radio transmitter. The opera-

tion of a radio frequency amplifier is the same in a radio receiver and in a radio transmitter. The patent drawing shows a resistance 21 connected in series with the secondary coil 18 of the radio frequency transformers 18–19, and a variable tuning condenser 20 shunted across the series connection of resistance 21 and secondary coil 19.

The specification states, "the resistance 21 is added because it has been found to render more stable the operation of the amplifier 22."

Latour's resistances 16 and defendant's resistances R 1 and R 2 are in parallel across their respective radio frequency transformers. Professor Hazeltine explained the difference between the effect of damping resistances in series as compared with the effect of damping resistances in parallel and showed that the series connection of Heising is ineffective for stabilization at high frequencies, whereas the parallel connection in Latour's case is very effective for stabilization at high frequencies and that the parallel connection of the Atwater Kent receiver is still better for stabilization at the high frequencies, where it is needed most.

Latour's parallel resistance connection therefore is an improvement over Heising's series connection, and the defendant's parallel resistance connection with the fixed grid-filament capacitance in series with the resistance is an improvement over Latour. Heising did not patent his series arrangement. The only possible effect of Heising's patent is to restrict the scope of Latour's claims to a parallel connection of the damping resistances. It does not invalidate the claims.

In Fig. 6 of Heising's second patent No. 1,343,562, a receiver is shown in which the damping resistance 85 is inserted in series with a tuned secondary coil 83 of a radio frequency transformer for the purpose of controlling oscillations, just like resistance 21 in the first Heising patent. This patent was considered by the patent office before the claims in suit were allowed. None of these claims is anticipated if the stabilizing means are restricted to resistances in parallel with the primary or secondary coils of the radio frequency transformers.

The reissue patent does not disclose any tuned radio frequency circuit. The defendant's receiver does employ tuned radio frequency circuits. The record does not disclose that there is any difference in principle of operation in applying Latour's stabilizing resistances in untuned or in tuned circuits.

There is nothing in the Nolan Act, 35 U.S.C.A. § 80 et seq., prejudicial to plaintiff's rights. The intent of this act was to extend the right of priority under Sec. 4887, R.S., 35 U.S.C.A. § 32, to applications filed abroad during the war, provided corresponding applications were filed in the United States prior to September 3, 1921.

There is no basis for defendant's contention that when the benefits of the Nolan Act are involved, the words "for the same invention" should be restricted to mean what is set forth in the "claims" or résumé of the foreign patent rather than the disclosure of the patent.

In the Patent Office the disclosure of the foreign application and not the "claims" always have been taken into account. See Kling v. Haring, 56 App.D.C. 153, 11 F. 2d 202; Prescott v. Michelin, 57 App.D.C. 104, 17 F.2d 863. The French patents disclose the invention that is set forth in the United States reissue patent.

On February 29, 1924, during the prosecution of the application, Latour filed an amended eighth claim, reading: "In the reception of signals of high frequency, a method which consists of amplifying to the greatest possible extent oscillations of high frequency, then lowering the frequency, then in amplifying anew to the greatest possible extent the oscillations at the lowest frequency thus obtained."

On November 15, 1924, that claim and other broad claims were cancelled and replaced by the claims as they now stand.

The earliest date on which the defendant placed on the market a receiver like that charged to infringe was April 30, 1924. That was after the assertion by Latour of the broad eighth claim on February 29, 1924. There is, therefore, no merit to defendant's contention that broad claims covering defendant's receiver were inserted long after the defendant's receiver had been on the market.

The claims in suit need not be given the scope of any cancelled broad claims in order to reach defendant's device.

For the reasons set forth, I believe that by limiting the resistances to resistances in parallel with the primary or secondary coils of the radio frequency transformers, the claims in issue have not been anticipated and are valid and that all the elements of

the patented combination claimed are substantially embodied in Atwater-Kent Model 35, operating therein in substantially the same way to produce substantially the same result and accordingly are infringed by the defendant.

Claim 9 of patent No. 1,614,136 reads: "Amplifying apparatus for radio and like signals, comprising a plurality of thermionic tubes each having filament, plate and grid electrodes, circuits including said electrodes, a high-frequency transformer coupling circuits of adjacent thermionic tubes in cascade, said transformer comprising separate primary and secondary windings, the circuits of said windings being closely coupled electro-magnetically, and a capacity connected across at least one of said windings and arranged to constitute a single resonant unit with said transformer as a whole."

Claim 11 adds thereto the words "and adjustable means for tuning said resonant unit to the frequency of the current to be amplified."

Zenneck's definition of close coupling ("Wireless Telegraphy" 1st Ed. p. 81, Sec. 53), accepted by both parties, reads as follows: "Any coupling between two circuits involves not only an action or effect of the primary on the secondary but also a reaction of the secondary on the primary circuit. If the reaction is so slight as to have very little effect upon the oscillations in the primary circuit, the coupling is said to be 'loose', or if the reaction is not noticeable the coupling is said to be 'extremely loose'. If the reaction is very marked, we speak of 'close' coupling."

Mr. Waterman, for the defendant, testified: "We might take an intermediate coupling, one which has been known as loose coupling in the art; that in which the reaction of one circuit upon the other just doubles the resistance. That I have always known as loose coupling. * * * So the criteria by which Zenneck's definition must be interpreted are the largeness or smallness of these reactions as compared to what is generally accepted as loose."

In view of the language of the claims in issue the coupling must be sufficiently close to make the primary and secondary circuits of the transformer tune as a whole so that the two windings plus the tuning circuits constitute a single resonant unit.

Whether or not the primary and secondary circuits tune as a whole is determined by observing the effect of the adjustment of the tuning condenser on the electrical constants of the primary coil.

The drawings in Latour's patent No. 1,-614,136 show radio frequency transformers having iron cores with coextensive primary and secondary windings interleaved or "sandwiched together" and imbedded in the iron core, reducing to a minimum the magnetic leakage between the coils and giving a coupling of 99%, almost the closest possible electromagnetic coupling between primary and secondary coils and circuits.

Defendant's receiver does not use in its high frequency amplifier iron cores or coextensive primary and secondary coils, or coils that are sandwiched together. It makes use of air cores. Its primary coil is short and its secondary coil is long, and its primary coil covers only a small portion of the secondary coil at the end of the secondary coil. This is equivalent to separating the coils or placing a separate leakage inductance coil in the circuit of the secondary coil and gives a coupling of about 45%.

Plaintiff contends that the circuits of the primary and secondary windings of the defendant's radio frequency transformer are closely coupled, and tune as a whole.

The defendant contends that these circuits are not closely coupled and do not tune as a unit but that the secondary alone tunes without affecting the primary circuit, and it further contends that the prior art and the proceedings whereby plaintiff avoided the prior art limit plaintiff's claim to transformers having iron cores, or at least to transformers wthout any leakage coils, and that defendant's receiver does not infringe the claim so limited.

Defendant's witness Waterman, to determine to what extent the tuning of the secondary coil of defendant's transformer affected the electric constants of the primary circuit, found that the tuning increased the impedence of the primary coil from about 500 ohms to 1,200 ohms at different settings of the condenser. To this he added 10,000 ohms, the resistance of the vacuum tube in the circuit, in coming to the conclusion that the transformers are loosely coupled and do not tune as a unit.

Defendant's witness Hazeltine testified that the 10,000 ohms resistance of the tube must be excluded because that resistance does not affect the oscillations resulting from a change in the degree of coupling.

Defendant's witness McDonald showed by curves the reaction of one circuit upon

the other and that the rate of variation of the impedence of the two circuits caused by tuning the secondary is almost exactly the same in both. Defendant's witness Hazeltine also showed mathematically that the tendency towards instability of a receiver with an ideal of 100% coupling is measured by the relative number 26, and that of model 35 with a 45% coupling by the relative number 30, and a transformer with only 9% coupling by the number 147 to establish that the stability of plaintiff's 99% coupling transformer and defendant's 45% coupling transformer is almost the same, and much greater than in the case of loose coupling of 9%.

The defendant urges that even if the plaintiff were right in these contentions, the Atwater-Kent transformer could not be held to infringe the patented claims in view of the prior art, and the proceedings in the Patent Office.

The specification states that the object of the invention is to provide thermionic tube amplifiers constructed in the manner set forth in Latour's patent No. 1,405,523, granted February 7, 1922. This patent relates only to iron core transformers. The drawings show only iron core transformers.

Fig. 1 of Alexanderson's patent No. 1,-173,079 shows air core radio frequency transformers, the secondary having the series leakage inductance $i$. In Fig. 2 the leakage inductance $i$ which makes the coupling in Fig. 1 looser, is omitted, and the coupling is closer than in Fig 1. In Fig 4 is shown a coupling consisting of only a single coil without any leakage inductance, the closest that can be attained, and that necessarily tunes as a unit.

Defendant's radio frequency transformer is in all respects like the transformer disclosed in Alexanderson's Fig. 1.

To avoid the prior art cited by the Patent Office Latour emphasized the fact that he was using iron cores and that his close coupling was not confined to the coils, but included the circuits. From November, 1918, when the application was filed, to April 2, 1926 all amendments had been limited to iron core transformers as an essential element, or to transformers having minimized magnetic leakage between the primary and secondary windings, the tightest inductive coupling that can be obtained. In 1926 the claims were made to require in addition that the circuits including the transformer windings shall be closely coupled electromagnetically.

In distinguishing Fessenden's patent No. 742,779, issued October 27, 1903, which showed iron core radio frequency transformers, Latour stated: "Fessenden's description is silent as to whether or not there is minimized magnetic leakage between the primary and secondary windings of the transformer employed in his system. However, in the drawing of this patent the primary and secondary windings are shown far apart and considering the low permeability of iron at low inductions, the coupling could not be considered as tight. Furthermore, the fact that the circuits of the primary and secondary windings are independently tuned indicates that these circuits are not tightly coupled. Even if the transformer of Fessenden's disclosure could be constructed so that there is a minimum of magnetic leakage, the results of this construction would be defeated since *Fessenden had introduced a series inductance such as 7 and 7a, which is equivalent to having magnetic leakage between the windings of his transformer. * * *

"These claims as rewritten are believed to describe applicant's invention in better form by reciting that *the circuits including windings of the transformer are closely coupled electromagnetically.* They therefore clearly distinguish from the disclosure of Fessenden in which *a series inductance such as 7 and 7a prevent close coupling between the circuits including the primary and secondary windings* of each transformer." (Latter italics, the Court's.)

He pointed out that in Fessenden the additional series or leakage coil of the iron core transformer would prevent the circuits from being closely coupled, even if the coils or windings were otherwise closely coupled, and consequently that circuits even though they contain closely coupled transformer coils are not closely coupled when one of the circuits contains an additional (leakage) coil. He thereby excluded all transformers like those in Alexanderson Fig. 1 and like defendant's transformer with its overhanging portion of the secondary coil.

Commenting on Alexanderson's patent No. 1,173,079, Latour's attorneys said, "Referring especially to Fig. 1 of the Alexanderson patent, it will be noted that each of the tuned circuits includes a separate induction which has the necessary effect of giving loose coupling between the circuits of the various transformers such as 2, 12 and 18."

Plaintiff secured its patent by limiting the claims to closely coupled circuits as dis-

tinguished from closely coupled windings and expressly abandoned all claims to coupled circuits containing an additional coupling-loosening coil such as Alexanderson's coil $i$ or defendant's long secondary coil and short primary coil coextensive with only a small portion of the secondary coil.

In the demonstration of world-wide radio telephone transmission and reception by the American Telephone & Telegraph Company in 1915, the primary coil and secondary coil of the radio frequency transformer were separately wound around concentric cylinders of unequal diameters. Variability in degree of coupling between the coils was obtained by sliding one inside the other.

The degree of coupling between the primary and secondary coils of those transformers was capable of variation from zero to 78%. The instructions which accompanied the receivers were as follows: "The external output impedence of a high frequency amplifier and hence the power output may be varied considerably by the coupling of transformer F, Fig. 1. The coupling of these and of the coils A and B should be adjusted to produce the loudest signals. The tuning is, of course, the more selective the looser the coupling. It is necessary then to strike a mean which will be determined by the working conditions between high selectivity and low intensity and high intensity and low selectivity."

Although there is no evidence of the exact degrees of coupling that were used, and the Arlington signals could be received with coupling of about 3%, the evidence discloses that the transformers were sometimes closely coupled and sometimes loosely coupled; the coupling was varied over a wide range from a coupling of a value of perhaps 50% or even more under conditions of close coupling to coupling of the order of a few per cent. under favorable atmospheric conditions. Plaintiff asserts that any coupling over 15% or 20% is close. Yet the telephone company's coils were constructed so they could be coupled 78%.

While prosecuting his application the patentee stated: "The essential feature of applicant's invention consists in using for the purpose in view, transformers having iron cores provided each with an air gap. * * * Applicant's arrangement requires magnetic cores and a close coupling of the windings."

By reason of the prior art and the patentee's proceedings in the Patent Office the claims must be limited to radio frequency transformers using iron cores or transformers without leakage inductance coils or their equivalent. The defendant's receiver does not infringe the claims so limited.